# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RICHARD RUDLOPH,<br><br>            *Plaintiff*,<br><br>    v.<br><br>ABBOTT LABORATORIES, INC.,<br><br>            *Defendant*. | Civil Action No.: 3:18-cv-06071<br><br>**MEMORANDUM AND ORDER** |

Plaintiff Richard Rudolph ("Rudolph" or "Plaintiff") brings this employment

discrimination suit under the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq*.

("ADEA") and the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1, *et seq*.

("NJLAD").  He argues that his employer, Defendant Abbott Laboratories, Inc. ("Abbott" or

"Defendant") discriminated against him based on his age when it terminated him in 2017.

Presently before the Court is Defendant's motion for summary judgment.  (ECF No. 48).  For the

reasons that follow, Defendant's motion is denied.


## FACTUAL BACKGROUND

### A.  DEFENDANT'S ORGANIZATIONAL STRUCTURE AND PERFORMANCE STANDARDS

Abbott is a global healthcare company with various operations, including

pharmaceuticals, medical devices, nutrition, and diagnostic testing.  (Def.'s Statement

Undisputed Material Facts ("DSUMF") ¶ 1, ECF No. 48-2).  The company is composed of

several different business units, one of which is Abbott Diagnostics.  (*Id.*).  Within Abbott

Diagnostics is Abbott Point of Care ("APOC") – an organization that develops medical

diagnostic testing.  (*Id.* at ¶ 1-2).  As relevant to this case, APOC's two primary product lines are

1

the i-STAT and Piccolo.  (*Id.* at ¶ 2-3).  Both are handheld devices that allow a health care provider to perform diagnostic tests.  (*Id.*).

APOC is divided into three sales teams that focus on different end-user customers: International, Large Hospital, and Channel.  (*Id.* at ¶ 5).  Channel's sales target distributor and ambulatory end-user customers, such as medical offices, urgent care centers, and small hospitals. (*Id.* at ¶ 6).  Large Hospitals only sells the i-STAT product directly to large hospitals.  (*Id.* at ¶ 7).  The Channel and Large Hospital teams report to the Divisional Vice President for U.S. Commercial Sales, while the International team is under separate leadership.  (*Id.* at ¶ 8).

Plaintiff was employed by Abbott for approximately fifteen years.  He served in various sales positions between 1995 and 2003, at which point he left the company to pursue other opportunities.  (Pl.'s Counterstatement of Facts Opp. Def.'s Mot. Summ. J. ("PCSF") ¶¶ 7-14, ECF No. 54-3; DSUMF ¶ 12).  In 2009, he returned to Abbott as a Marketing Manager for the Channel team.  (*Id.*).  He was promoted to Sales Director of that team in May 2010.  (DSUMF ¶ 12; PCSF ¶ 19).  In that role, Plaintiff directly oversaw three Regional Sales Managers who, in turn, supervised twenty-one sales representatives.  (*Id.* ¶ 13; Pl.'s Response to Def.'s Statement Material Facts ("PRDSUMF") ¶ 13, ECF No. 54-2).

In or around May 2015, Jeffrey Devlin became the Divisional Vice President for U.S. Commercial Sales of APOC.  (DSUMF ¶ 9).  Plaintiff reported directly to Devlin.  (*Id.* at ¶ 10). Also reporting directly to Devlin was Mark Klopping, the General Manager for the Large Hospitals team.  (*Id.* at ¶ 11).  Devlin is approximately six years younger than Plaintiff, and Klopping and Plaintiff are approximately the same age.[1]  (DSUMF ¶ 11; PCSF ¶ 1).

---

[1] Plaintiff was born in 1961, Klopping in 1960, and Devlin in 1967.  (PCSF ¶ 1; Def.'s Mot. Summ. J. Ex. 8, ECF No. 48-9; PCSF ¶ 50).

Abbott, and APOC specifically, had monthly and annual internal sales quotas, known as "plans," for each product.  (DSUMF ¶ 4, 14).  Plans are internal goals that are not reported outside Abbott, unlike the company's sales numbers.  (Dep. of Jeffrey Devlin ("Devlin Dep.") 72:1 – 73:22, Ex. 13, ECF No. 54-5).  Corporate leaders within Abbot Diagnostics set plans each year, which are divided into smaller subsets and assigned to individual sales directors, regional sales managers, and sales representatives.  (*Id*. ¶ 15).  Supervisors have discretion to allocate plans among the employees who directly report to them.  (*Id*. ¶ 15).  As such, Devlin received the national plan from his supervisor and then determined how to distribute it between Plaintiff and Klopping who, in turn, allocated plans among their direct reports.  (*Id*.; *see also* Devlin Dep. 77:7 – 78:7, ECF No. 54-5).  Meeting plan was an elevated priority under Devlin's leadership, and was tied to employees' assessments, incentives, and continued employment.  (DSUMF ¶ 19-22).

The sales targets within the Plan and whether Plaintiff achieved the targets are subject to dispute between Plaintiff and Devlin.  Plaintiff points to several markers of his strong performance as Channel Sales Director.  (*See* Pl.'s Opp. Br. 8-11, ECF No. 54).  For example, he testified that, before Devlin became his supervisor, he increased Channel's annual business from under $30 million to over $90 million, with positive growth each year.  (PCSF ¶ 20).  In addition, he exceeded plan four times, earned the President's Award[2] four times, and received an overall rating of "exceeded expectations" twice and "achieved expectations" three times.  (*Id.* ¶ 21, 30-37, 48).  He also cites consistently positive reviews from his former supervisors; even

---

[2] President's Club is an award that reflects an employee's sales relative to others.  It is based on an employee's fulfilment of his or her plan rather than revenue in sales.  The top-ranked employees are eligible to go on a winner's trip.  (Devlin Dep. 207:8 – 210:6, ECF No. 48-5).

when he missed plan by 5% in 2011, and by 1.7% in 2014, he still received a rating of "achieved expectations."[3]  (*See id.* ¶ 24-30, 42-43).

In 2015, Plaintiff's first year reporting to Devlin, he exceeded plan, was rated "achieved expectations," and received the President's Club Award, even though he did not meet plan for each product during each month of that year.  (PCSF ¶ 60-62; DSUMF ¶ 23).  During his 2015 performance review, Devlin gave Plaintiff positive feedback but also noted several areas for improvement, such as managing underperformers on his team.  (PCSF ¶ 64; DSUMF ¶ 24-26, PRSMF ¶ 25-26; Plaintiff's 2015 Performance Review, ECF No. 48-7).

At the end of 2015, Defendant terminated Gary Hamil – one of the three Regional Managers Plaintiff supervised – because, as Plaintiff acknowledged, he had repeated performance and core competency issues over the course of two years and missed plan by nearly 30%.  (DSUMF ¶ 28; PRDSUMF ¶ 28).  Hamil was approximately the same age as Plaintiff and was replaced with Francisco Merrill, who was significantly younger, upon Plaintiff's recommendation.[4]  (DSUMF ¶ 28, 32; PRDSUMF ¶ 28, 32).  Merrill joined Ron Gonzales and Andy Bielitz – the two other Regional Managers who reported to Plaintiff – on the Channel team.  (DSUMF ¶ 33).  Bielitz and Gonzales are close in age to Plaintiff.[5]

## B. PLAINTIFF'S 2016 PERFORMANCE

In 2016, the Channel team fell behind on its monthly plans and appeared to be on track to miss the annual plan.  (*Id.* ¶ 34).  As a result, Devlin and Plaintiff had several strategy calls

---

[3] Plaintiff attributes his failure to meet plan in 2014 to the fact that the 2014 sales plan increased by nearly 20 million dollars from the previous year.  (PRDSUMF ¶ 18).  He maintains that he increased Channel's sales by nearly 11.5 million dollars that year, and that his supervisor at the time wrote that "2014 was yet another successful year for Rich and the Channel organization," and that he was "a valuable member of my direct staff."  (*Id.*).

[4] Merrill was born in 1977 and Hamil in 1961.  (Def.'s Mot. Summ. J. Ex. 8, ECF No. 48-9).

[5] Bielitz was born in 1960 and Gonzales in 1964.  (Def.'s Mot. Summ. J. Ex. 8, ECF No. 48-9).

during which Devlin stressed the importance of capital sales and directed Plaintiff to improve his sales forecasting accuracy. (*Id.* ¶ 35-38; PRDSUMF ¶ 35-38). Despite Plaintiff's efforts to improve performance among the Regional Managers, the Channel team missed plan by 4.4% in 2016. (DSUMF ¶ 40-47).

For the first time in his career at Defendant, Plaintiff received a "partially achieved expectations" rating on his annual review in 2016, which he argues was "riddled with inaccuracies and cherry-picked data." (PCSF ¶ 88; PRDSUMF ¶ 53; DSUMF ¶ 53). For example, he argues his 2016 performance review incorrectly stated that capital sales of Piccolo declined, rather than increased, compared to the prior year. (PCSF ¶ 88; Plaintiff's 2016 Performance Assessment at 0129, D-21, ECF No. 48-4). Defendant explained that Plaintiff's sales increased after his 2016 performance review, and that the review was based on then-current data. (DRPCSF ¶ 88; Devlin Dep. 256:23 – 257:13, ECF No 54-5). Nevertheless, Plaintiff claims that he grew Channel's business by over $4 million and exceeded plan in certain metrics that year, and that the 2016 plan increased by over $10 million from the 2015 plan. (PCSF ¶ 69-70, 77).

Plaintiff attributes missing the 2016 plan to several external factors over which he had no control. First, he contends that Abbott's decision to terminate its partnership with Fisher, one of its primary small hospital distributors, led to a sales reduction that was predictable and beyond his control. (PRDSUMF ¶ 47; DSUMF ¶ 47; Devlin Dep. 248:2 – 251:20, ECF No 54-5). Specifically, Fisher had no incentive to distribute Abbott's products to small hospitals in 2016 because it would no longer be receiving cartridge sales for those products. (PRDSUMF ¶ 47). Devlin acknowledged that the drop in sales due to Fisher's termination had "nothing to do with Rich Rudolph" and was not held against him. (Devlin Dep. 251:5-20, ECF No. 54-5). However,

Devlin argues that Channel became aware of Fisher's upcoming termination in December 2015 and, therefore, knew that Small Hospitals would not be an area of sales growth in 2016. (Def.'s Reply to Pl.'s Response to Def.'s Statement of Undisputed Material Facts ("DRPR") ¶ 47 n.2, ECF No. 60-1). Likewise, Devlin acknowledged that changes in reimbursement levels due to new healthcare legislation and regulations could impact sales in 2016, and he discussed those externalities with Plaintiff and expected a "responsive change in strategy." (Defendant's Response to Plaintiff's Counterstatement of Facts ("DRPCSF") ¶ 76, ECF No. 60-2).

Second, Plaintiff believes he was unfairly blamed for the vacancies on his team. (Plaintiff's 2016 Performance Assessment at 0129; Dep. of Lisa Siko ("Siko Dep.") 164:1-5, Ex. 32, ECF No. 54-6). Lisa Siko of Human Resources testified that there was a higher turnover rate within APOC during Devlin's tenure, including within the Channel team, which caused at least some of those vacancies. (Siko Dep. 162:23 – 163:24, 164:164:14-20, ECF No. 54-6). She recalled that, during exit interviews, a number of departing employees cited changes made under Devlin's leadership as a reason for their decision to leave Defendant. (Siko Dep. 161:17 – 162:14, ECF No. 54-6). Indeed, Devlin took responsibility for the high turnover rate and vacancies on Channel. (Devlin Dep. 184:7 – 185:1, ECF No. 54-5). However, Defendant maintains that Plaintiff should have filled those vacancies regardless of why they existed, and that Devlin was not specifically at fault for employees leaving the company. (DRPR ¶ 42; DRPCSF ¶ 96-98).

Ultimately, because (1) the Channel team, each Regional Manager, and Plaintiff himself missed plan in 2016, (2) Plaintiff had missed plan in 2014 and 2016, and (3) Gonzales had missed plan four years in a row, Devlin spoke with Lisa Siko and Amy Frost (of Employee Relations) in December 2016 about "managing" Plaintiff's performance. (PRDSUMF ¶ 47;

DSUMF ¶ 49-52; PCSF ¶ 79).  During that call, Devlin remarked that Rudolph was "anchored in the past" and described his plan to place Plaintiff on a PIP and potentially replace him.  (PCSF ¶ 79, 81; Devlin Dep. 226:10 – 227:9, ECF No 54-5; Dep. of Amy Frost ("Frost Dep.") 98:14 – 99:5, Ex. 31, ECF No. 54-6).  He also asked whether Plaintiff "ever mentioned to anybody . . . that he wants to retire."[6]  (PCSF ¶ 81; Devlin Dep. 234:1-25, ECF No. 54-5, Siko Dep. 243:17-20, ECF No. 54-6).  Frost testified that question was raised in the context of identifying potential options for Plaintiff, such as "could we offer him another job, could he do something else within the company," or "if he would be eligible to retire."  (Frost Dep. 101:5-24, ECF No 60-4).

### C. PLAINTIFF'S PERFORMANCE MANAGEMENT

At Devlin's direction, Plaintiff was placed on a ninety-day PIP beginning in January 2017.  (PRDSUMF ¶ 52, 54; DSUMF ¶ 54).  According to Plaintiff, that decision was improper because (1) neither Siko nor Frost looked at any of the sales data before or after he was put on a PIP – rather, they relied on the information Devlin provided, (PCSF ¶ 157; Siko Dep. 262:3 – 264:1, ECF No. 54-6; Frost Dep. 41:7 – 42:18, 119:18 – 120:23, ECF No. 54-6); and (2) Klopping and his four Area Sales Directors on the Large Hospitals team missed plan in 2016 yet were not placed on a PIP, despite Devlin's policy that meeting plan was the top priority.[7] (PRDSUMF ¶ 91-92; PCSF ¶ 101).  Devlin testified that there are numerous factors involved in a decision to place an employee on a PIP aside from meeting plan, (Devlin Dep. 213:15-17, ECF

---

[6] At Defendant, an employee must be at least fifty years old to be eligible for retirement.  (Siko Dep.244:12-24, ECF No. 54-6).

[7] In 2016-17, the four Large Hospitals Directors who reported to Klopping were: Joe Freels (born 1972), Kevin Ball (born 1965), Guido Manzo (born 1956), and Brad Cox (born 1966).  (DSUMF ¶ 90; PRDSUMF ¶ 90).  Therefore, out of Klopping and his four Area Sales Directors, only Freels was younger than fifty years old in 2016, and he had the highest results against plan of the four Directors.  (DSUMF ¶ 91; PRDSUMF ¶ 91).  Plaintiff argues that Manzo was terminated during Devlin's leadership but, according to Defendant, Manzo left voluntarily because he did not agree that he needed to improve his performance.  (PCSF ¶ 102; DRPCSF ¶ 102).

No. 48-5), and that Plaintiff was underperforming in long-term strategy and leadership behavior, (Devlin Dep. 280:17 – 281:2, ECF No. 48-5).[8]  Further, while Plaintiff relies on total revenue to argue that Large Hospitals performed worse than Channel in 2016, Defendant asserts that the proper metric is performance relative to plan – because Large Hospital sales were three times greater than Channel Sales – and Channel missed plan by a larger margin than did Large Hospitals.  (PRDSUMF ¶ 91, 54; DSUMF ¶ 91; DRPR ¶ 91).

The PIP required Plaintiff to (1) achieve specific sales performance requirements each month in each of the three regions; (2) make three thirty-day sales forecasts with more than 90% accuracy; (3) deliver 100% accurate and current Salesforce.com data at the end of each month; and (4) grow McKesson (a distributor partner) 10% in ambulatory sales from the previous year. (PRDSUMF ¶ 55; DSUMF ¶ 55; *see also* Channel 2017 Action Plan ("PIP") 4-5, Ex. 20, ECF No. 54-5).  According to Defendant, the PIP addressed areas for improvement that Devlin had previously discussed with Plaintiff.  (DSUMF ¶ 56-59; *see also* Coaching and Feedback Provided dated Jan. 19, 2017, D-22, ECF No. 48-4).  The PIP stated that "[f]ailure to demonstrate immediate, consistent and sustained performance improvement could result in: further corrective counseling, disciplinary action . . . and/or termination."  (PIP at 5).

Plaintiff told Devlin that some of the PIP objectives were unrealistic, such as (1) the mandate to meet plan for each product in each territory every month, and (2) the requirement to forecast sales with near-perfect accuracy when a distributor, not Defendant, was making the actual product sales.  (PCSF ¶ 103-04; PRDSUMF ¶ 56).  Devlin agreed it was difficult to

---

[8] For example, in Klopping's 2016 performance review, Devlin wrote that even though plan was not achieved, "significant progress was made in all key areas of business focus" and "monthly forecasting and leading metrics were all in line with this year's increased expectations."  He noted that "missing goals are never acceptable and this is no exception for 2016," but acknowledged Klopping's achievement of substantial growth across all product lines and numerous other specific accomplishments.  (Klopping 2016 Performance Assessment, Moving Br. Ex. 12, ECF No. 48-9).

forecast sales under the distribution model but believed Plaintiff could dedicate resources to improve that metric within his team.  (Devlin Dep. 283:19 – 284:3, 287:13 – 288:22, ECF No. 54-5).

Plaintiff was also expected to implement PIPs for the Regional Managers.  (PRDSUMF ¶ 58; DSUMF ¶ 58).  He did so for Gonzales and Bielitz, but not for Merrill, the newest and youngest Regional Manager.  (PRDSUMF ¶ 60-69; DSUMF ¶ 60-69).  The parties dispute whether that decision was based on Devlin's instruction or Merrill's relatively strong performance and short time in his position.[9]  (*Id.*; PCSF ¶ 108-09, 147; Devlin Dep. 186:3-13, ECF No. 48-5; Dep. of Andy Bielitz ("Bielitz Dep.") 97:7-13, Ex. 23, ECF No. 54-5; Dep. of Ron Gonzales ("Gonzales Dep.") 59:21-24, Ex. 30, ECF No. 54-6; DRPR ¶ 60-69).  Siko believed that Merrill was not put on a PIP because he "had been promoted partway through the year and so did not have the ability to impact sales for the course of a full year," and that there is a "learning curve" "any time someone moves from one role to a higher level role."  (Siko Dep. 202:2-5, 213:5-8, Ex. 5, ECF No. 48-9).  She did not recall any Regional Manager or Sales Director being placed on a PIP within their first year at an APOC organization.  (Siko Dep. 313:4-8, Ex. 5, ECF No. 48-9).

### D.  BIELITZ'S AND GONZALES'S DISCRIMINATION GRIEVANCES

Gonzales, who was then fifty-two years old, complained to HR that only the youngest Regional Manager was not placed on a PIP, which he attributed to age discrimination by Devlin.  (PRDSUMF ¶ 63).  Bielitz, who was fifty-six years old at the time, complained to HR about Devlin's alleged age discrimination both before and after he was placed on a PIP.  (PCSF ¶ 130,

---

[9] Plaintiff contends that Gonzales generated nearly $3 million more in sales revenue than Merrill, but Merrill came closer to achieving his plan, which was lower than Gonzales's plan.  (PCSF ¶ 111).

135).  Neither Gonzales nor Bielitz had previously complained to HR about age discrimination or about any other manager.[10]  (PCSF ¶ 115, 132-33; Bielitz Dep. 146:5-18, ECF No. 54-5).

Bielitz testified that he felt Devlin discriminated against him based on his age, and that Devlin was biased toward younger employees.[11]  (PCSF ¶ 122-29; Bielitz Dep. 27:1 – 28:2, 38:15 – 39:2, 141:16 – 142:1, ECF No. 54-5).  Yet Defendant points out that, in his deposition, Bielitz admitted to seeing Devlin subject employees of all ages to abusive treatment, contrary to his position that Devlin targeted older employees.  (DRPCSF ¶ 124; PCSF ¶ 124; Bielitz Dep. 101:17 – 102:8, ECF No. 60-4).

In addition, Bielitz insisted that "exceptions were made" to the requirement that employees meet plan to qualify for President's Club, because some younger employees who did not meet plan still received the award.  (PRDSUMF ¶ 21; Bielitz Dep. 39:7 – 40:17, Ex. 23, ECF No. 54-5).  Devlin testified that although meeting plan was required for President's Club, there was "management discretion" in whether someone who did not meet plan could participate in the incentive plan or the winners' trip.  (Devlin Dep. 173:21 – 175:4, Ex. 2, ECF No. 48-5).  Defendant explained that exceptions to the President's Club process were only granted upon request by a direct manager for employees who achieved at least 99% of plan – and Bielitz missed plan by 5% during the year in question.  (DRPR ¶ 21; DRPCSF ¶ 129).  Bielitz acknowledged that he did not understand the process by which exceptions to the President's Club could be made.  (DRPCSF ¶ 129; Bielitz Dep. 39:13 – 44:18, Ex. 3, ECF No. 60-4).

---

[10] Plaintiff himself never raised a concern about age discrimination while he was employed by Defendant.  (DSUMF ¶ 88; PRDSUMF ¶ 88).

[11] For example, Bielitz testified that Devlin favored two employees in their thirties over older members of the team like himself – even though he had been awarded President's Club for seven years and had ranked first among Regional Managers reporting to Plaintiff nearly every year.  (Bielitz Dep. 136:1-25, 146:19 – 147:10, ECF No. 54-5).  When Bielitz was put on a PIP at the end of 2016, he had achieved 94.87% of his plan and was ranked number one in the President's Club.  (Siko Dep. 200:24 – 201:11, ECF No. 48-9).

Gonzales never received a response to his discrimination complaint against Devlin, and Bielitz was told his complaint was unsubstantiated.[12]  (PCSF ¶¶ 116, 138).  Bielitz voluntarily left Defendant at the end of November 2017, citing Devlin's leadership style as the reason for his departure, (PRDSUMF ¶ 70; DSUMF ¶ 70), and Gonzales left Defendant one month later. (PCSF ¶ 116).  Neither was terminated for failing to meet their PIP objectives.  (DSUMF ¶ 70; PRDSUMF ¶ 70; Siko Dep. 303:22-23, ECF No. 48-9).

## E.  PLAINTIFF'S PIP RESULTS

On or about March 23, 2017, Devlin conducted a mid-PIP update.  (*See* 60-Day Update, Opp. Br. Ex. 38, ECF No. 54-6).  Plaintiff disputes the accuracy of certain data and information in that update.  (PRDSUMF ¶ 73-75, 77, 80; PCSF ¶ 149-155).  He submitted a rebuttal with his interpretation of the sales data, insisting that his numbers were higher than what Devlin determined and that he was on track to successfully complete the PIP.  (Rebuttal to 60-Day-Upate, Opp. Br. Ex. 38, ECF No. 54-6; PRDSUMF ¶ 81; Devlin Dep. 312:18 – 213:8, ECF No. 54-5).

A review of the data in the record shows that the parties rely on different numbers to measure various aspects of Plaintiff's performance.  For example, Plaintiff asserts he exceeded plan in certain months or for certain products, while Defendant maintains that he did not meet plan for each product in each region for each month of the PIP.  (*See* DRPR ¶¶ 71, 77, 81; PRDSUMF ¶¶ 36, 71, 74, 77, 78; DSUMF ¶¶ 71, 77, 78; February and March 2017 Reporting Package, Ex. P-20, ECF No. 48-8 ("P-20")).  The same is true regarding the parties'

---

[12] Plaintiff asserts Devlin's credibility is suspect because he denied ever hearing about claims of age discrimination against him, even though Nitorshi Wilson (of Employee Relations) asked him questions related to Bielitz's claim. (PCSF ¶ 144-46; Opp. Br. at 26-27).  Defendant counters by pointing to Wilson's testimony that she did not recall whether she told Devlin about Bielitz's complaint, as well as Devlin's testimony that he recalled speaking with Wilson about Bielitz but could not remember the details.  (DRPCSF PCSF ¶ 144-45; Devlin Dep. 193:1 – 194: 7, ECF No. 60-4).

interpretations of Plaintiff's forecasting accuracy data.  (See DRPR ¶ 72; PCSF ¶ 162; DSUMF ¶ 72; PRDSUMF ¶ 72; DRPCSF ¶ 162; 60-Day Update at 2, 4; Rebuttal to 60-Day Update at 3). In other instances, Defendant argues that Plaintiff relies on metrics that yield more favorable results – such as quarterly plan and performance against prior year – rather than the required monthly quotas.  (DSUMF ¶ 74; DRPCSF ¶ 150, 155; *see also* DRPR ¶ 73; DRPCSF ¶ 151).

To explain his drop in sales at the end of the PIP period, Plaintiff points out that Defendant announced a price increase on certain products effective March 2017, which led distributers to front-load purchases of those products in January and February 2017, followed by a predictable sales decrease in March 2017.  (PRDSUMF ¶ 77).  Devlin acknowledged the price change was expected to lead to a sales decrease, but that "if you had a good flow on your pipeline and your forecasting, you wouldn't have a giant deviation versus your plan . . . ." (Devlin Dep. 305:12-23, ECF No. 54-5).

Plaintiff also complained that Devlin asked Defendant's Assistant Financial Controller to "adjust" Plaintiff's 2017 sales numbers to discount (1) a one-time $453 million sale of i-STAT, and (2) $350 million in Piccolo sales that took place before the March 2017 price increase – both of which resulted in Plaintiff missing plan by 3% rather than exceeding it by 1.4%.  (PCSF ¶ 165-66; Email from Jeffrey Mulaski dated April 5, 2017, Ex. 40, ECF 54-6).  Devlin testified such adjustments were a regular practice to reflect the impact of one-time sales that "you can't count on happening regularly."  (Devlin Dep. 157:12-20, 160:4 -18, 308:18 – 309-7, ECF No. 54-5).  He explained that such "analytical assessments are imperative . . . because if we didn't maybe we [would] think that this will continue."  (Devlin Dep. 162:1-3, ECF No. 54-5).  Further, Defendant asserts that the financial adjustment occurred in April 2017 – after Plaintiff's

performance against the PIP was assessed and his termination was recommended.  (DRPCSF ¶ 165).

In addition to missing the sales quotas set forth in the PIP, Devlin reported that Plaintiff did not meet the 100% accuracy requirement for Salesforce data in the mid-PIP review. (DSUMF ¶ 72).  In his rebuttal, Plaintiff attempted to explain why some of the data was not accurate and argued that Devlin's 100% accuracy expectation was not realistic.  (Rebuttal to 60-Day Update at 4-5).  Further, the parties agree that McKesson's sales growth increased by approximately 9.7%, which fell short of the 10% PIP objective.  (PRDSUMF ¶ 79; DSUMF ¶ 79).  According to Devlin, missing that goal by .03% was not an independent reason for Plaintiff's termination.  (Devlin Dep. 297:9-21, ECF No. 54-5).

After Plaintiff submitted his rebuttal to the mid-PIP review, Devlin testified that they went over the data together and discussed the fact that they were "seeing these numbers totally differently," but Plaintiff continued to rely on different sales numbers to support his arguments. (Devlin Dep. 313:8 – 314:3, ECF No. 54-5).  While Devlin did not necessarily believe that the numbers Plaintiff relied on were wrong, he was frustrated that he "wasn't able to either have [Plaintiff] understand or want to change."  (*Id.*).

### F.  PLAINTIFF'S TERMINATION AND THE PRESENT ACTION

During March 2017, Devlin discussed the mid-PIP results with Siko and Frost. (PRDSUMF ¶ 81; DSUMF ¶ 81).  Devlin considered Plaintiff's performance against the PIP objectives and determined that he would be unable to successfully complete the PIP.  (DSUMF ¶ 81-82; Devlin Dep. 118:11 – 119:25, ECF No. 54-5).  Further, Devlin testified that Plaintiff responded nonchalantly when the two discussed areas for improvement sixty days into the PIP,

which factored into Devlin's assessment of Plaintiff's leadership maturity and dedication to succeeding.  (Devlin Dep. 319:8-25, ECF No. 48-5).

Devlin recommended Plaintiff's termination after the PIP period concluded, and received approval from Siko and Frost.  (PRDSUMF ¶ 81; DSUMF ¶ 81, 83; Siko Dep. 115:14 – 117:23, ECF No. 48-9; Frost Dep. 43:9-22, Ex. 6, ECF No. 48-9; Devlin Dep. 112:2-13, ECF No. 54-5; Email from Amy Frost dated April 20, 2017, Ex. 42, ECF No. 54-6).  Plaintiff was approximately fifty-five years old when he was terminated.  (PCSF ¶ 1).

During a phone conversation in April 2017, Devlin, Siko, and Frost discussed, but did not decide, how to communicate Plaintiff's departure to the Channel team.  (PRDSUMF ¶ 83-85; DSUMF ¶ 83-85).  Plaintiff confirmed with Human Resources that he wished to retire from Defendant, but did not necessarily consent to that information being shared with other team members.  (DSUMF ¶ 84-85).  Frost sent Devlin information about how to terminate an employee, which included an instruction to tell the team "Rich is no longer working at Abbot . . . Do not elaborate further.  Respect the confidentiality of the employee who was separated." (Email from Amy Frost dated April 20, 2017, Ex. 42, ECF No. 54-6).

Although Devlin notified Cynthia Haegley, the Director of Human Resources, that the team would simply be told "today was Rich's last day with Abbott," he ultimately told the Channel team that "Rich finally retired."  (PRDSUMF ¶ 85-86; DSUMF ¶ 86; PCSF ¶ 169-71; Email from Jeffrey Devlin dated April 20, 2017, Ex. 41, ECF No. 54-6).[13]  Siko acknowledged that the phrase "finally retired" could be interpreted as an inherently age-related comment.  (Siko Dep. 139:15-19, ECF No. 54-6).  According to Defendant, that comment was a "stray remark"

---

[13] Devlin testified that he did not remember making that comment.  (Devlin Dep. 107:2-4, ECF No. 48-5).

that is insufficient to establish discrimination.  (Def.'s Mot. Summ. J. ("Moving Br.") 24, ECF No. 48-1).

After Plaintiff's termination, he was replaced by Josh Renihan, who is ten years younger.[14]  (PCSF ¶ 178).  Devlin did not play a role in selecting Renihan.  (DSUMF ¶ 95; PRDSUMF ¶ 95).  Devlin was placed on administrative leave in November 2018 due to poor performance and is no longer employed by Defendant.  (PCSF ¶ 180).

Plaintiff filed a charge with the Equal Employment Opportunity Commission (EEOC) on June 29, 2017, alleging age discrimination.  (Compl. Ex. 1, ECF No. 1).  The EEOC issued a Dismissal and Notice of Rights informing Plaintiff of his right to sue Defendant within 90 days of receiving that letter, which was mailed on January 12, 2018.  (Compl. Ex. 2).  Plaintiff timely filed the instant lawsuit on April 11, 2018.  (Compl. at 1).

## LEGAL STANDARD

A motion for summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A factual dispute is 'genuine' if the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020), *amended*, 979 F.3d 192 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "A factual dispute is 'material' if it 'might affect the outcome of the suit under the governing law.'"  *Id.*

"The Court must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."  *Id.* (quoting *Anderson*, 477 U.S. at 255).  Moreover, summary judgment "is inappropriate when the evidence is susceptible of different interpretations

---

[14] Renihan was born in 1970.  (Def.'s Mot. Summ. J. Ex. 8, ECF No. 48-9; PCSF ¶ 50).

or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). "This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Dellapenna v. Tredyffrin/Easttown Sch. Dist.*, 449 F. App'x 209, 212 (3d Cir. 2011) (quoting *Stewart v. Rutgers*, 120 F.3d 426, 431 (3d Cir. 1997)).

## DISCUSSION

### A. AGE DISCRIMINATION LAWS

Under the ADEA, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Individuals of at least forty years of age are protected under the Act. *Id.* § 631(a). A plaintiff can establish a prima facie case of age discrimination by showing that (1) at the time s/he was fired, s/he was at least forty years old; (2) the defendant took an adverse employment action against the plaintiff; (3) the plaintiff was qualified for the position; and (4) s/he was replaced by someone sufficiently younger to support an inference of discrimination. *Gress v. Temple Univ. Health Sys.*, 784 F. App'x 100, 104 (3d Cir. 2019) (citing *Smith v. City of Allentown*, 589 F.3d 684, 689-91 (3d Cir. 2009)). "Adverse employment action" may refer to a discharge, transfer, or demotion, *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 411-12 (3d Cir. 1999), but not the decision to place an employee on a performance improvement plan, *Reynolds v. Dep't of Army*, 439 F. App'x 150, 153-54 (3d Cir. 2011).

Similarly, the NJLAD makes it unlawful for an employer "to refuse to hire or employ or to bar or to discharge or require to retire . . . from employment [an employee] or to discriminate against [the employee] in compensation or in terms, conditions or privileges of employment" based on his or her age. N.J. Stat. Ann. § 10:5-12(a). Courts look to federal law when analyzing

a prima facie case of age discrimination under NJLAD. *Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 65 (3d Cir. 1996); *Rodier v. Chico's FAS, Inc.*, No. CIV. 11-4769 (RBK/AMD), 2013 WL 6147781, at *4-5 (D.N.J. Nov. 22, 2013). The primary difference between the two statutes for the purpose of establishing a prima facie case is that individuals need not be forty years old to be protected against age discrimination under NJLAD. *Hanna v. Lincoln Fin. Grp.*, No. CV 19-02273, 2020 WL 6445932, at *8 (E.D. Pa. Nov. 3, 2020).

According to the Third Circuit, "[w]e do not require that age discrimination be the sole cause for an adverse employment decision to prevail on an age discrimination claim." *Robinson v. City of Philadelphia*, 491 F. App'x 295, 299 (3d Cir. 2012). Instead, courts inquire whether age discrimination had a "determinative influence" on the decision. *Palmer v. Britton Indus., Inc.*, 662 F. App'x 147, 150 (3d Cir. 2016); *see also Smith v. M&M Mgmt. Co.*, No. 3:17-CV-7978 (BRM-LHG), 2019 WL 1397401, at *7 (D.N.J. Mar. 28, 2019); *Shields v. Penns Grove-Carneys Point Reg'l Sch. Dist.*, No. CV 14-2106 (RMB/JS), 2016 WL 818815, at *5 (D.N.J. Mar. 1, 2016); *Buchholz v. Victor Printing, Inc.*, 877 F. Supp. 2d 180, 185 (D.N.J. 2012).

## B.  *McDonnell Douglas* Burden-Shifting Framework

Where a plaintiff lacks direct evidence of age discrimination, as here, courts apply the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas*. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework,

> Plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination. Once the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to rebut the proof of discrimination by articulating some legitimate, nondiscriminatory reason for the employee's discharge.

*Jalil v. Avdel Corp.*, 873 F.2d 701, 706 (3d Cir. 1989).

Next, the plaintiff has the burden of "proving by a preponderance of the evidence that the alleged reasons proffered by the defendant were pretextual and that the defendant intentionally discriminated against the plaintiff." *Id.* at 706.  The Third Circuit set forth a two-prong test in *Fuentes* to analyze whether a defendant's articulated reasons are pretext:

> [A] plaintiff may defeat a motion for summary judgment (or judgment as a matter of law) by pointing "to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."

*Jones*, 198 F.3d at 413 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

Under the first prong of *Fuentes*, a plaintiff "need not produce evidence that necessarily leads to the conclusion that the employer acted for discriminatory reasons" but, rather, must identify "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder could rationally find them 'unworthy of credence.'"  *Simpson v. Kay Jewelers*, 142 F.3d 639, 644 (3d Cir. 1998) (alteration in original) (quoting *Fuentes*, 32 F.3d at 764-65).

Under the second prong, a plaintiff may show, for example, that the employer previously discriminated against her or other members of her protected class, or "that the employer has treated more favorably similarly situated persons not within the protected class."  *Simpson*, 142 F.3d at 645 (citing *Fuentes*, 32 F.3d at 765).  However, "the mere favorable treatment of one younger manager as compared to one older manager may not be sufficient to infer age discrimination."  *Id.*  A plaintiff cannot "pick and choose a person she perceives is a valid comparator who was allegedly treated more favorably, and completely ignore a significant group of comparators who were treated equally or less favorably than she."  *Id.* at 646-47.  Further,

subjective beliefs or speculation, without factual support, are insufficient to support an inference of discrimination. *Ekhato v. Rite Aid Corp.*, 529 F. App'x 152, 156 (3d Cir. 2013).

Finally, courts in our circuit have held that an inference of discrimination is weakened when a decision maker is a member of the same protected class as the plaintiff; however, "evidence of the decision makers' membership in the protected group is not dispositive as to whether discrimination took place." *Dungee v. Ne. Foods, Inc.*, 940 F. Supp. 682, 688 n.3 (D.N.J. 1996); *see also Ziegler v. Delaware Cty. Daily Times*, 128 F. Supp. 2d 790, 811 n.47 (E.D. Pa. 2001).

### C. DEFERENCE TO EMPLOYER'S EVALUATION CRITERIA

As long as an employer's evaluation criteria bears a relationship to the employee's performance, courts "will not second guess the method an employer uses to evaluate its employees." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 468 (3d Cir. 2005). Indeed, the Third Circuit has rejected efforts to challenge the appropriateness of an employer's chosen means to assess its employees' performance or qualifications.

In *Simpson*, like the present matter, the plaintiff failed to meet sales quotas and adequately train staff to do so during the preceding six-month period. 142 F.3d at 643. As a result, she was put on a performance improvement plan and then demoted after she did not improve. *Id.* In her age discrimination suit, she did not dispute that she and her staff repeatedly failed to attain sales quotas; rather, she argued "that the use of sales quotas as the criterion is suspect" and "not determinative of the adequacy of a manager's performance." *Id.* at 645, 647. The court held that "[w]hether sales quotas or evaluation scores are a more appropriate measure of a manager's performance is not for the court (or factfinder) to decide." *Id.* Further, the court noted that an inference of improper motive may be raised when there is a discrepancy between

the criteria an employer uses to evaluate different employees, but not when there is a discrepancy between the criteria used by the employer and that relied upon by the plaintiff. *Id.* at 648. Thus, the question is whether the plaintiff satisfied the criteria identified by the employer, and his "positive performance in another category is not relevant." *Id.* at 647.

Similarly, in *Stanziale v. Jargowsky*, 200 F.3d 101, 106-07 (3d Cir. 2000), summary judgment for the defendant employer was appropriate where the plaintiff employee did not dispute that he had fewer educational qualifications than the selected candidate but, rather, argued those qualifications were not necessary for the job in question and that his other experience should have been weighed more heavily. And in *Kautz*, the plaintiff's argument that his employer should have relied on total bookings instead of the comparison between two fiscal years as a measure of performance was unavailing "because it is axiomatic that the mere fact that a different, perhaps better, method of evaluation could have been used is not evidence of pretext unless the method that was used is so deficient as to transgress the *Fuentes* standard." 412 F.3d at 471. Further, Kautz neither rebutted his superiors' rationale for their chosen evaluation metric (*i.e.*, that marketing potential varied from region to region), nor "offered a sound basis for his own conclusion that total booking numbers are a better method of evaluation." *Id.*

Although an employer has wide discretion in choosing how to evaluate its employees, it "may not use evaluating criteria which lacks any relationship at all to the performance of the employee being evaluated." *Id.* at 468.

The Third Circuit has also made clear that a plaintiff cannot defeat summary judgment simply by attributing his underperformance to external factors. In *Keller*, an employee who was terminated argued that his failure to meet a fundraising objective was due to factors beyond his control. 130 F.3d at 1109. The court stated that

> [w]hether Keller could have met or come close to the $1.5 billion goal under the business conditions that prevailed from 1989 to 1992 is a complicated question that would be difficult to resolve without expert testimony of a sort that is lacking in the summary judgment record of this case.  But the relevant question is not whether Keller could have done better; instead, the relevant question is whether the evidence shows that it was so clear that Keller could not have done better that [his employer] could not have believed otherwise.

*Id.*  Thus, the key inquiry is whether an employer's "dissatisfaction with [the employee's] performance was so clearly unfounded that it cannot have been sincere."  *Id.* at 1110.

### D.  AGE-RELATED COMMENTS

The Third Circuit has held that "comments by those individuals outside of the decision making chain are stray remarks, which, standing alone, are inadequate to support an inference of discrimination."  *Walden v. Georgia-Pac. Corp.*, 126 F.3d 506, 521 (3d Cir. 1997).  However, such remarks may provide circumstantial evidence of discrimination and may indicate "the atmosphere in which the employment decision was carried out."  *Id.*

For example, in *Brewer v. Quaker*, an executive's comment that "two of our star young men in their mid–40s. That age group is our future" – made two years before the plaintiff's termination – was "relevant to show the corporate culture in which a company makes its employment decision, and may be used to build a circumstantial case of discrimination."  *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 333 (3d Cir. 1995).  That comment appeared in a written newsletter and was considered "evidence of managerial policy" rather than "an off-hand comment made by a low-level supervisor."  *Id.* at 334.

Similarly, a supervisor's comment that losing weight would make an employee "feel better" and "look younger" was "entitled to some weight . . . although standing on its own it would likely be insufficient to demonstrate age-related animus."  *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 502 (3d Cir. 1995).  The Third Circuit found that "[a] reasonable jury could conclude

that this evidence of discrimination, coupled with Waldron's prima facie case, proved that age discrimination was more likely than not a determinative factor in Waber's decision to terminate Waldron's employment." *Id.* Significantly, the comment was made by the person who ultimately approved the decision to terminate the plaintiff. *Id.*; *see also Antol v. Perry*, 82 F.3d 1291, 1301-02 (3d Cir. 1996).

By comparison, one manager's comments that a plaintiff was "old school," "old-fashioned," and looked like an "old professor" were insufficient to defeat summary judgment because they were "attenuated from the decision to terminate." *Milham v. Cortiva Educ., Inc.*, 302 F. App'x 70, 71 (3d Cir. 2008). In *Milham*, the manager who made those comments was part of a team that decided to terminate the plaintiff, but other team members played a bigger role, and the plaintiff could not refute their claims about his inadequate performance. *Milham v. Cortiva Educ., Inc.*, No. CIV.A. 06-04226, 2007 WL 3146669, at *6 (E.D. Pa. Oct. 25, 2007), *aff'd*, 302 F. App'x 70 (3d Cir. 2008). The district court noted that "the comments of one manager, while relevant, are not sufficient, without more evidence, to support an inference that age based discrimination was the motivating factor in Mr. Milham's termination." *Id.* at *7.

### ANALYSIS

Defendant concedes that Plaintiff has established a prima facie case of age discrimination with respect to his termination in 2017. (Moving Br. at 8). The Court's analysis will proceed under the *McDonnell Douglas* framework because Plaintiff offers indirect evidence of age discrimination. Defendant's age-neutral justification for terminating Plaintiff is that he missed plan in 2016, "allowed 5 out of 21 sales territories to remain vacant of a sales representative," failed to "effectively manage his sales team and hold them accountable to sales targets," and did not meet the PIP requirements. (Interrogatory No. 1, Opp. Br. Ex. 43, ECF No. 54-6). Thus,

Plaintiff bears the burden to show that Defendant's proffered explanation for his termination is mere pretext.  Under *Fuentes*, he may do so by pointing to evidence (1) that could lead a reasonable jury to disbelieve Defendant's stated reasons for his termination, or (2) that age discrimination was more likely than not the true reason.  *Fuentes*, 32 F.3d at 764.

To support his argument that Defendant's stated reasons for his termination are pretext for age discrimination, Plaintiff posits that (1) his performance was not, in fact, deficient; (2) Devlin exhibited bias in favor of younger employees; and (3) Devlin's retirement-related comments are evidence of his age discrimination.  (Opp. Br. at 11).  Each argument will be analyzed in the following subsections.

### A.  PLAINTIFF'S PERFORMANCE

As a general theme, Plaintiff frequently relies on total sales, total revenue, quarterly data, President Club rankings, year-to-date performance, and performance over prior year to support his argument that his performance was not deficient.  He also repeatedly emphasizes that, unlike sales numbers, plans are not disclosed to Wall Street, the SEC, or the public.  (*See, e.g.*, Moving Br. at 15).

However, employers are entitled to choose the metrics by which they evaluate their employees' performance, and Defendant chose achieving plan.  *See Kautz*, 412 F.3d at 468. Indeed, Defendant explained that plan was a preferable metric because sales and revenue varied across different teams and regions.  As such, Plaintiff's past evaluations are immaterial because previous supervisors may have applied different assessment criteria, and Devlin made clear that meeting plan was a top priority under his leadership.  There is no evidence that Defendant applied that evaluation criteria in a discriminatory manner, *see Simpson*, 142 F.3d at 648; rather, Plaintiff invites the Court to focus on different criteria instead.  Third Circuit case law counsels

against doing so.  *See Simpson*, 142 F.3d at 643-48; *Kautz*, 412 F.3d at 468-71; *Stanziale*, 200 F.3d at 106-07.

The record shows that Plaintiff did not (1) meet each PIP objective for sales of i-STAT and Piccolo, (2) meet the forecasting goal of at least 90% accuracy each month, (3) grow McKesson by 10%, or (4) meet the 100% accuracy requirement for Salesforce data.  In responding to those numbers, Plaintiff either relies on his preferred means of assessing performance, insists that his underperformance was due to factors outside his control, or argues that the PIP expectations were unreasonable and represented a deliberate attempt to set him up for termination.  Each argument will be addressed below.

First, as previously discussed, the Court will not second-guess an employer's choice of performance standards.  Therefore, Defendant was entitled to (1) choose "meeting the plan" as its method of assessment, (2) use it as a factor in placing Plaintiff on a PIP, and (3) terminate Plaintiff when he did not meet the PIP objectives.  Plaintiff's arguments are rejected to the extent that they rely on performance criteria not selected by Defendant.

Plaintiffs' second and third points are interrelated, regarding whether Defendant's performance expectations were reasonable.  Under *Fuentes*, an employer may not evaluate an employee based on factors that have nothing to do with his individual performance.  *Kautz*, 412 F.3d at 470.  Here, Plaintiff argues he was unfairly blamed for (1) the sales decrease in March 2017 caused by Defendant's price increase, (2) vacancies on his team that occurred during Devlin's tenure, (3) sales decreases following Defendant's decision to terminate its partnership with Fisher, and (4) his failure to forecast with at least 90% accuracy sales that were controlled by distributors rather than Channel.  (*See* Opp. Br. at 19-22, n.18).  Defendant – and Devlin

himself – acknowledged that the above factors may have been beyond Plaintiff's control, yet he was expected to adopt strategies to overcome those challenges.

Overall, the Court finds that Plaintiff has raised a genuine dispute of material fact regarding (1) whether he was evaluated based on factors that did not pertain to his own performance, *see Kautz*, 412 F.3d at 468; and (2) whether Defendant could have sincerely expected him to achieve his quotas under the circumstances, *see Keller*, 130 F.3d at 1110.  There are questions of fact regarding whether Plaintiff's 2016 plan, PIP, and 2016-2017 performance evaluations were reasonable – that is, whether they took into account the aforementioned externalities that may have caused him to miss plan.  There is insufficient evidence in the record for the Court to make that factual determination.

Overall, under *Fuentes*, Plaintiff has presented evidence that could lead a reasonable factfinder to "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Fuentes*, 32 F.3d at 764.  To be clear, there is no genuine dispute about whether Plaintiff achieved his performance objectives; rather, there are lingering factual questions regarding whether those objectives were unreasonable under the circumstances, and whether Devlin had a discriminatory intent when he designed Plaintiff's PIP and terminated him.[15]

---

[15] The Court acknowledges that Plaintiff's termination, and not his placement on a PIP, is the adverse employment action for the purpose of establishing a prima facie case of age discrimination.  However, whether Plaintiff's performance objectives could have been achieved under the circumstances is relevant to the question of whether Devlin had a discriminatory intent, and, therefore, whether the proffered reason for his termination was pretext.

B. **EVIDENCE OF DEVLIN'S AGE BIAS**

i.     **EMPLOYEES PLACED ON PIP**

Plaintiff asserts that Devlin's age discrimination was the underlying reason why he, Bielitz, and Gonzales – but not Merrill – were placed on PIPs, and why he was ultimately terminated.  While the parties dispute whether it was Plaintiff's or Devlin's decision not to place Merrill on a PIP, it is undisputed that Merrill had the highest performance against plan out of the three Regional Managers and had been in his position for less than one year at that time.  According to Siko, it was uncommon, and perhaps unheard of, for an employee to be placed on a PIP within the first year in a new role.

Further, "the mere favorable treatment of one younger manager as compared to one older manager may not be sufficient to infer age discrimination."  *Simpson*, 142 F.3d at 645.  Here, Plaintiff selectively chooses one younger employee who was allegedly treated more favorably, yet ignores members of his own age group who were treated more favorably as well.  Klopping and three of his direct reports on the Large Hospitals team were in the same protected age group as Plaintiff but were not placed on a PIP or terminated, despite failing to meet plan in 2016.  And Gonzales and Bielitz, who were close in age to Plaintiff, were not terminated for failing to meet their PIP objectives.  Aside from Merrill, Plaintiff has not specifically identified similarly situated, younger employees who were allegedly treated more favorably despite missing plan.

ii.     **BIELITZ'S AND GONZALES'S STATEMENTS**

Plaintiff proffered at oral argument that Bielitz and Gonzales would testify at trial about Devlin's age bias.  Both, based upon their observations, believe Devlin engaged in age discrimination.  Relying on Bielietz's and Gonzales's depositions, Abbott argues it impeached the credibility of each.  For example, Bielitz believed Devlin was biased against older

employees, but he conceded that Devlin had an abusive management style in general and humiliated employees of different ages.  In addition, Bielitz claimed that Devlin made exceptions for younger employees to participate in the President's Club despite missing plan, but he later admitted he was unaware that only employees who achieved 99% of plan could receive an exception based on a manager's recommendation.  Moreover, neither Gonzales's nor Bielitz's claims of discrimination against Devlin were substantiated.

Although Abbott claims it impeached the credibility of both Bielitz and Gonzales, this is a question for the jury.  As such, Gonzales and Bielitz may testify about their observations of Devlin's age bias and the jury will determine the credibility of their remarks.

### iii.   DEVLIN'S RETIREMENT COMMENTS

In December 2016, shortly before placing Plaintiff on a PIP, Devlin asked Siko and Frost whether Plaintiff was retirement eligible or whether he had mentioned wanting to retire.  During that same call, Devlin stated that Plaintiff was "anchored in the past."  (Devlin Dep. 226:10 – 227:9, ECF No 54-5; Frost Dep. 98:14 – 99:5, Ex. 31, ECF No. 54-6).  Approximately four months later, after making the decision to terminate Plaintiff, Devlin told the Channel team that Plaintiff "finally retired."  (PRDSUMF ¶ 85-86; DSUMF ¶ 86; PCSF ¶ 169-71).  Siko acknowledged that comment could be interpreted as inherently-age related.  Plaintiff contends that the "anchored in the past" comment, even if not inherently-age-related, supports an inference of discrimination in the context of the other circumstantial evidence in the record.

Devlin's comments, if taken as discriminatory, would not be stray remarks because the first comment occurred immediately before Rudolph was placed on a PIP, the second occurred immediately after he was terminated, and Devlin was the primary decisionmaker in Rudolph's termination.  Siko and Frost approved Devlin's recommendation to terminate Plaintiff, but they

relied entirely on the data and information he presented about Plaintiff's performance.  And the timing of the comments – four months before and immediately after Plaintiff's departure – indicate that they were not attenuated from Devlin's decision to terminate Plaintiff.  As such, Devlin's age-related comments, combined with (1) his role in setting Plaintiff's PIP objectives, (2) his decision to terminate Plaintiff, and (3) Plaintiff's prima facie case, provide relevant circumstantial evidence of age discrimination.  *See Antol*, 82 F.3d at 1301-02; *Waldron*, 56 F.3d at 502.  Overall, Devlin's comments support Plaintiff's argument that Defendant's stated reasons for his termination were pretext.

## CONCLUSION

Plaintiff has raised a genuine dispute of material fact regarding whether his termination was based on age discrimination.  A reasonable factfinder could conclude that Devlin deliberately set performance goals that Plaintiff could not meet – or unfairly blamed him for factors beyond his control – in an attempt to create a "legitimate" reason to fire him, as demonstrated by his age-related comments shortly before and after Plaintiff's termination.  Drawing all inferences in Plaintiff's favor, a jury could conclude that Defendant's proffered reason for his termination was pretext.  Further, summary judgment is inappropriate where, as here, the evidence is susceptible to different inferences or interpretations, and where motive or intent are contested.  *See Hunt*, 526 U.S. at 553; *Dellapenna*, 449 F. App'x at 212.  For the foregoing reasons, Defendant's motion for summary judgment shall be denied.

<u>**O**RDER</u>

**THIS MATTER** having come before the Court on motions for summary judgment filed by Defendant Abbott Laboratories, Inc. (ECF No. 48); and the Court having carefully reviewed and taken into consideration the submissions of the parties, as well as the arguments and exhibits therein presented; and for good cause shown; and for all of the foregoing reasons,

**IT IS** on this 2nd day of March 2021,

**ORDERED** that Defendant's motion for summary judgment is **DENIED**.


s/*Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.